[Cite as *State v. Williams*, 2018-Ohio-5202.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-17-1148

        Appellee                          Trial Court No. CR0201603351

v.

Jerome Williams                         **DECISION AND JUDGMENT**

        Appellant                         Decided:  December 21, 2018

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Alyssa Breyman, Assistant Prosecuting Attorney, for appellee.

Emil G. Gravelle III, for appellant.

* * * * *

**MAYLE, P.J.**

**{¶ 1}** Following a bench trial, defendant-appellant, Jerome Williams, appeals the

June 2, 2017 judgment of the Lucas County Court of Common Pleas, denying his motion

to suppress evidence and imposing various costs as part of his sentence.  For the reasons

that follow, we reverse.

## I. Background

{¶ 2} On December 30, 2015, an employee of Barney's Convenient Mart, located at the BP gas station on Stickney Avenue, called 9-1-1 to report that a black car with tinted windows had been sitting in the parking lot with the engine running for over an hour. Toledo police officers Dustin Rausch and Sean Murphy were dispatched to the location.

{¶ 3} Officer Rausch pulled his police cruiser directly behind the bumper of the car, impeding its ability to leave. Officer Murphy approached the driver's side of the vehicle and knocked on the window. The driver began to roll down the window, but when he saw the officers, he rolled the window back up. Officer Murphy took out his baton, extended it, and told him to stop rolling up the window. The driver complied and in response to an order from the officers, identified himself as Jerome Williams.

{¶ 4} A check of Williams's record revealed that he had active warrants. He was arrested and his vehicle was searched. Officers found marijuana and a scale. When they booked him into the county jail, it was discovered that Williams had been concealing a package of heroin and pentylone in his anus, and he attempted to flush the contraband down the toilet when it was found.

{¶ 5} Williams was charged with (1) illegal conveyance of drugs of abuse onto the grounds of a specified governmental facility, a violation of R.C. 2921.36(A)(2) and (G)(2) (Count 1); (2) tampering with evidence, a violation of R.C. 2921.12(A)(2) and (B) (Count 2); (3) possession of heroin, a violation of R.C. 2925.11(A) and (C)(6)(a) (Count

2.

3); and (4) aggravated possession of drugs, a violation of R.C. 2925.11(A) and (C)(4)(a) (Count 4).

{¶ 6} Williams moved to suppress the evidence seized during the search of the vehicle and incident to his arrest. The trial court conducted a hearing, but denied Williams's motion. The matter proceeded to a bench trial.

{¶ 7} The trial court found Williams guilty of Count 2 (amended to R.C. 2921.12(A)(2) and (B)), Count 3, and Count 4 (amended to R.C. 2925.11(A) and (C)(1)(a)), and sentenced him to a prison term of 24 months on Count 2, 10 months on Count 3, and 10 months on Count 4. Counts 3 and 4 were ordered to be served concurrently to one another, and Count 2 was ordered to be served consecutively to Counts 3 and 4. The total term of imprisonment was ordered to be served concurrently with a sentence imposed in Lucas County case No. CR0201302506. The court also imposed terms of postrelease control on all counts, and ordered Williams to pay "all or part of the applicable costs of supervision, confinement, assigned counsel, and prosecution as authorized by law," and costs assessed under R.C. 9.92(C), 2929.18, and 2951.021.

{¶ 8} Williams appealed and assigns the following errors for our review:

Assignment of Error 1—The trial court erred in denying Appellant Jerome Williams's motion to suppress and not suppressing all evidence of illegal contraband gathered after the arrest.

3.

Assignment of Error 2—The trial court erred when it failed to notify Mr. Williams on the record and in open court that it imposed prosecution costs, supervision costs, confinement costs, assigned counsel costs, costs pursuant to R.C. 9.92(C), R.C. 2929.18, and R.C. 2951.021.

## II. Law and Analysis

{¶ 9} Williams argues in his first assignment of error that the trial court erred when it denied his motion to suppress evidence. In his second assignment of error, Williams claims that the trial court improperly imposed costs in this case. We examine each of these assignments of error in turn.

### A. Denial of Williams's Motion to Suppress

{¶ 10} In his first assignment of error, Williams claims that the trial court erred when it denied his motion to suppress evidence. He claims that Officers Rausch and Murphy's encounter with him constituted an investigatory detention that was performed without reasonable, articulable suspicion of criminal activity. He maintains that all evidence seized following that detention must be suppressed.

#### 1. The Officers' Testimony at the Suppression Hearing

{¶ 11} According to the evidence presented at the hearing on Williams's motion, at approximately 10:30 p.m., the clerk at the convenience mart called 9-1-1 and reported that a black Impala or Malibu had been running in the parking lot for more than an hour. She said that the vehicle's windows were tinted so she could not see if there was a male

4.

or a female—or anyone at all—in the vehicle. She provided her name and location. The operator said that she would dispatch someone to come check it out.

{¶ 12} Officer Rausch, who has three years' experience on the force, and Officer Murphy, who has three-and-one-half years' experience, arrived at the scene, which they described as being located in "more of a high-crime area than" some of the adjacent sectors of the city. They never spoke to the clerk who placed the 9-1-1 call; rather, they immediately parked their vehicle directly behind Williams's car, purposely impeding his ability to leave. Officer Rausch said that they did not activate the lights on the cruiser, but Officer Murphy could not remember if they had done so.

{¶ 13} The officers believed that the clerk had called because she was concerned for her safety because she was about to get off work. Notably, the clerk did not say this during the 9-1-1 call, she did not indicate that she was getting off work soon, and the officers did not know for sure when the gas station or convenience mart was closing. Officer Rausch speculated that the store would probably close at midnight—about an hour-and-one-half after the call—because "stores generally close around midnight."

{¶ 14} The officers approached the vehicle and knocked on the window. Williams began to roll down the window until he realized that it was the police. He then began to roll the window back up. Officer Murphy extended his baton, commanded Williams to roll the window back down, and ordered him to identify himself. Officer Rausch testified that Williams was not free to leave and they would have used the baton to break the window if Williams had not complied with their command that he roll the window back

5.

down. He agreed that they had exerted police authority over the vehicle and that they viewed the rolling-up of the window as noncompliance.

{¶ 15} The officers mentioned some concern that the driver may have had a medical issue, or perhaps had overdosed or been intoxicated. In fact, Officer Rausch said that his biggest concern was for the safety of any occupants of the vehicle. This concern was based not on any specific information conveyed by the clerk, but by the fact that there had been a number of heroin overdoses in Toledo and because the officers had seen "plenty of calls" involving intoxicated persons sitting in running vehicles. Notably, Officer Murphy could not recall whether they inquired into Williams's well-being.

{¶ 16} The officers conceded that it is not illegal to be sitting in a parked car and that the *only* conduct that was reported to them was that someone was sitting in a parked car. They received no information indicating that the person in the vehicle was engaged in any criminal behavior during the hour he was parked there. Nevertheless, Officer Rausch commented that there exists "reasonable suspicion" when a person is sitting in a parked car in a parking lot when a store is closing, and Officer Murphy described that Williams's action in rolling up the window heightened his suspicions that Williams was engaged in criminal activity.

### 2. The Trial Court Judgment

{¶ 17} The trial court denied Williams's motion to suppress. The court took judicial notice that the incident occurred in an "area of higher than normal criminal activity." It found that the information conveyed to the police officers was that the clerk

6.

was "either concerned for her safety or maybe even the store could be getting ready for closing, or maybe her shift was changing." It concluded that it was reasonable for the officers to pull in directly behind Williams's car, bumper-to-bumper, for police safety and because "it would be unreasonable to think under the circumstances that the police would do anything but pull in behind the car" as it could invite a police chase through the streets of Toledo. The court called it "a reasonable use of the police vehicle to pull it behind and to initiate a citizen contact."

{¶ 18} The court also found that the vehicle's dark tinted windows caused a reasonable concern for the officers' safety. It determined that knocking on the windows was not "invasive or overly concerning" and was "reasonably connected" to checking into the suspicious activity and checking into whether the person inside of the vehicle was passed out. The court acknowledged that it was a show of force to pull out the baton when Williams started to roll up the window, but it concluded that it was reasonable "because of not knowing what is going to come next." It found that the officers could reasonably have believed that "a potential weapon is in the car."

{¶ 19} The trial court concluded "under the totality of all these circumstances that the police acted * * * in a very reasonable fashion, very modestly approaching the situation," and there was "no over the top invasive actions by the police, no overt actions, other than a simple police * * * contact with an escalation of facts showing at least a mild suspicion to ask for an ID of the driver once obtained warrants were found."

7.

### 3. Protection Against Unreasonable Searches and Seizures

{¶ 20} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution protect citizens from unreasonable searches and seizures. "The U.S. Supreme Court has created three categories of police-citizen contact to identify the separate situations where constitutional guarantees are implicated: (1) consensual encounters, (2) investigative or '*Terry* [*v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)]' stops, and (3) arrests." (Citations omitted.) *State v. Staten*, 4th Dist. Athens No. 03CA1, 2003-Ohio-4592, ¶ 16.

{¶ 21} "Police may lawfully initiate a consensual encounter without probable cause or a reasonable, articulable suspicion of criminal activity." *Id.* at ¶ 17. An encounter may be said to be consensual when police "approach an individual in a public place, engage the person in conversation, and request information, as long as the person is free to walk away." *Id.* An officer may ask to examine a person's identification or search his or her belongings during a consensual encounter and he need not inform the citizen that he or she may decline the request and walk away. *Id.*

{¶ 22} But police must have reasonable, articulable suspicion of criminal activity to perform an investigatory stop. *State v. Mesley*, 134 Ohio App.3d 833, 840, 732 N.E.2d 477 (6th Dist.1999), citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 45 L.Ed.2d 607, 95 S.Ct. 2574 (1975). "An investigatory stop constitutes a seizure for purposes of the Fourth Amendment." *State v. Westover*, 2014-Ohio-1959, 10 N.E.3d 211, ¶ 16 (10th Dist.). A seizure will be said to have occurred when, "in view of all the circumstances

8.

surrounding the incident, a reasonable person would have believed that he was not free to leave." *State v. Ohlert*, 2d Dist. Montgomery No. 25389, 2013-Ohio-2579, ¶ 20. "Factors suggesting that a seizure has occurred include the presence of multiple police officers, the displaying of a weapon by the police, the use of language suggesting that compliance with police requests is compelled, and the physical touching of the person." *Staten* at ¶ 17.

{¶ 23} The parties here agree that the officers performed an investigatory stop when they approached Williams's vehicle. Ordinarily, "the mere approach and questioning of persons seated within parked vehicles" constitutes a consensual encounter and is not a seizure. *State v. Shrewsbury*, 4th Dist. Ross No. 13CA3402, 2014-Ohio-716, ¶ 16. But given that the officers here blocked Williams into his parking spot, preventing him from leaving, drew a baton very quickly into the encounter, and testified clearly that the vehicle was not free to leave and police authority had been exerted at the point the squad car was positioned behind it, we concur in the parties' assessment of the nature of this stop.[1] The question, therefore, is whether the officers had reasonable, articulable suspicion for detaining Williams.

---

[1] There is also a "community-caretaking/emergency-aid exception to the Fourth Amendment warrant requirement," which "allows police officers to stop a person to render aid if they reasonably believe that there is an immediate need for their assistance to protect life or prevent serious injury." *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037, ¶ 22. This exception has been recognized, for instance, in cases where a vehicle is stationary in an area where it should not be parked, thereby causing concern as to the vehicle's or the driver's impairment. *State v. Clapper*, 9th Dist. Medina No. 11CA0031-M, 2012-Ohio-1382, ¶ 13. *See, e.g., Bucyrus v. Lewis*, 66 Ohio App.3d

## {¶ 24} Totality of the Circumstances

{¶ 25} In determining whether officers have reasonable, articulable suspicion for conducting an investigative stop, courts must examine the totality of the surrounding circumstances. *State v. Freeman*, 64 Ohio St.2d 291, 293, 414 N.E.2d 1044 (1980), paragraph one of the syllabus. The Ohio Supreme Court has found several factors to be relevant in making that determination, including (1) whether the stop occurred in a high crime area; (2) whether the officer knew of recent criminal activity in the area; (3) the time of the stop; (4) whether the defendant's conduct was suspicious; and (5) the officer's training and experience. *City of N. Olmsted v. Tackett*, 8th Dist. Cuyahoga No. 81068, 2002-Ohio-6330, ¶ 16, citing *Freeman*, 64 Ohio St.2d 291, 295, 414 N.E.2d 1044; *State v. Andrews*, 57 Ohio St.3d 86, 88, 565 N.E.2d 1271 (1991); *State v. Bobo*, 37 Ohio St.3d 177, 179, 524 N.E.2d 489 (1988).

---

256, 258, 583 N.E.2d 1114 (3d Dist.1990) (observing that it was part of officer's job to find out if there was something physically wrong with driver asleep in truck in bank's drive-through lane at 4:30 p.m., but also concluding that reasonable, articulable suspicion existed); *State v. Chrzanowski*, 180 Ohio App.3d 324, 2008-Ohio-6993, 905 N.E.2d 266, ¶ 27-28 (11th Dist.) (concluding that officer may have had concerns for the well-being of driver of vehicle stopped partially on the roadway); *State v. Chapa*, 10th Dist. No. 04AP-66, 2004-Ohio-5070, ¶ 8. (finding that officer could reasonably have concerns that assistance was required where "vehicle [was] stopped in the middle of the roadway with its headlights on and leaving no room for other vehicles to pass"). But the state does not argue that this exception applies here and the facts do not support the applicability of this exception. *See City of Geneva v. Fende*, 11th Dist. Ashtabula No. 2009-A-0023, 2009-Ohio-6380, ¶ 31 (finding that officer's "failure to ask appellee whether she needed assistance indicates he did not suspect she had such need.").

10.

{¶ 26} Under certain circumstances, information obtained from police informants or from ordinary citizens who have personally observed what appears to be criminal conduct may supply an officer with reasonable, articulable suspicion. *State v. Oney*, 1st Dist. Hamilton Nos. C-940332, C-940333, 1995 Ohio App. LEXIS 526, *3 (Feb. 15, 1995). The extent to which law enforcement may rely on such a tip as forming the basis for reasonable, articulable suspicion depends on whether the informant is a criminal informant, an anonymous informant, or an identified citizen-informant. *State v. Yallah*, 11th Dist. Lake Nos. 2017-L-086, 2017-L-087, 2018-Ohio-2251, ¶ 12. A tip from an identified citizen-informant who reports possible criminal activity that she has just witnessed is presumptively reliable. *State v. Reed*, 12th Dist. Clermont No. CA99-11-102, 2000 Ohio App. LEXIS 4109, *13 (Sept. 11, 2000).

{¶ 27} But a "[a] person may not be detained, even momentarily, without reasonable, objective grounds to do so." *State v. Jackson*, 2017-Ohio-1369, 89 N.E.3d 98, ¶ 18 (8th Dist.). An officer making an investigatory stop must be able to articulate something more than intuition, an "inchoate and unparticularized suspicion," or a "hunch" that criminal activity is afoot. *State v. Rivera*, 6th Dist. Lucas No. L-04-1369, 2006-Ohio-1867, ¶ 18, quoting *Terry*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889. An investigatory stop cannot be justified by facts acquired as a result of the intrusion involved. *State v. Williams*, 8th Dist. Cuyahoga No. 81364, 2003-Ohio-2647, ¶ 21; *State v. Cunningham*, 9th Dist. Medina No. 14CA0032-M, 2015-Ohio-4306, ¶ 17. And "an officer's mere conclusion that an individual or a situation appears suspicious does not

11.

provide the requisite reasonable belief that a defendant is engaged in criminal activity[.]" *State v. Anderson*, 11th Dist. Geauga No. 2003-G-2540, 2004-Ohio-3192, ¶ 13.

{¶ 28} With these principles in mind, we examine the trial court's decision.

### 5. Review of the Trial Court Decision

{¶ 29} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When the trial court considers a motion to suppress, it acts as the factfinder and is in the best position to resolve factual questions and to evaluate the credibility of witnesses. *Id.* We, therefore, must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* Our role then is to independently determine, without deference to the trial court's conclusion, whether the facts satisfy the applicable legal standard. *Id.*

{¶ 30} In denying Williams's motion to suppress, the trial court correctly identified that the totality of the circumstances must be considered. It found that "under the totality of all these circumstances that the police acted, these two officers, in a very reasonable fashion, very modestly approaching the situation." It concluded that there were no "over the top intrusive actions" and that the officers had "at least a mild suspicion" to ask for Williams's identification. It deemed that this was "a reasonable police contact with a citizen," and that the officers' conduct was "reasonable."

{¶ 31} While it is clear that the court identified the appropriate test to be applied, it is less clear that the court applied the test to the relevant question at issue here: whether

12.

the officers had reasonable, articulable suspicion to detain Williams. It appears that the court may have instead applied the test merely to evaluate the reasonableness of the officers' conduct.

{¶ 32} But even assuming that the trial court applied the totality-of-the-circumstances test to the correct issue, we disagree with the trial court's conclusions concerning the significance of the factors it considered. We evaluate some of those factors as they have been applied by Ohio courts and in light of the circumstances presented in this case.

{¶ 33} *The time of the stop.* Where an investigatory stop occurs very late at night or early in the morning, courts have found that this fact, combined with additional factors, may support a finding of reasonable, articulable suspicion. In *Freeman*, 64 Ohio St.2d 291, 295, 414 N.E.2d 1044, for instance, the Ohio Supreme Court held that the time of day—3:00 a.m—combined with several other facts justified the stop in question. *See also State v. Taylor*, 10th Dist. Franklin No. 05AP-1016, 2006-Ohio-5866, ¶ 12 ("[T]he time of night is a proper consideration."). The trial court noted that the stop here occurred at approximately 10:30 p.m., presumably making the point that it was late. However, in *State v. Lentz*, 6th Dist. Lucas No. L-14-1091, 2015-Ohio-913, ¶ 21, we deemed that 11:00 p.m. was "not an overly-late hour." And given the officers' speculation that the gas station would remain open until approximately midnight, we find that the time of night was not a factor counseling in favor of finding reasonable, articulable suspicion.

13.

{¶ 34} *Whether the suspect was engaged in suspicious conduct.* Ohio courts have held that furtive movements, such as hiding or ducking, may constitute suspicious conduct. *Taylor* at ¶ 6. For instance, in *Bobo,* 37 Ohio St.3d 177, 180, 524 N.E.2d 489, the Ohio Supreme Court found that Bobo had acted suspiciously because he looked directly at the approaching officers then "popp[ed] up and then duck[ed] down or lean[ed] forward" in his vehicle. While we note that the windows of Williams's vehicle were tinted, the officers here observed no furtive movements before approaching the vehicle. The only "suspicious" behavior they identified was that Williams was seated in a running car for an hour in a parking lot—conduct the officers acknowledged was not illegal.

{¶ 35} Numerous Ohio courts, including this court, have evaluated cases where the only "suspicious" behavior involved a suspect sitting in a parked car. In *State v. Wallace*, 145 Ohio App.3d 116, 761 N.E.2d 1143 (6th Dist.2001), an officer, during a routine patrol, noticed two people sitting in a running car in a parking lot. He pulled his cruiser up to the car, blocking the vehicle from leaving, and approached the car "to see if everything was okay." *Id.* at 118. The occupants were startled upon seeing the officer, then attempted to ignore him, rolling up the window when he asked to speak with them. Not able to leave because of the position of the cruiser behind his vehicle, the driver, Wallace, responded to questions from the officer, at which point the officer noticed the smell of alcohol on his breath and burned marijuana in the vehicle. Wallace was arrested.

14.

{¶ 36} Wallace moved to suppress the evidence, and the trial court granted his motion, concluding that the officer had stopped Wallace without reasonable, articulable suspicion. The state appealed. We affirmed the trial court's decision granting Wallace's motion to suppress. Most of our decision is devoted to explaining why the stop was not consensual, as had been argued by the state. But we also concluded that the officer did not form reasonable, articulable suspicion that Wallace was engaged in criminal activity until *after* he had already been stopped or seized.

{¶ 37} Similarly, in *State v. Warner*, 7th Dist. Columbiana No. 15 CO 0026, 2016-Ohio-4660, officers were dispatched to a parking lot after receiving a call from a Family Dollar employee that there was a suspicious vehicle that had been parked there awhile with someone in it. The court found that the call, by itself, did not establish reasonable, articulable suspicion of criminal activity.

{¶ 38} In *State v. McCord*, 8th Dist. Cuyahoga No. 93127, 2010-Ohio-1979, police received an anonymous tip that the occupants of a parked Hummer were engaged in drug activity. Officers dispatched to the scene blocked the Hummer in with their vehicles and approached the car, ordering the occupants to show their hands. When one of the occupants dropped one of his hands, the officer drew his gun and ordered the occupants out of the vehicle. The occupants were found to be in possession of drugs.

{¶ 39} McCord, the driver, moved to suppress the evidence, arguing that the officers lacked reasonable, articulable suspicion of criminal activity necessary to effectuate the stop. The Eighth District agreed. It found that the only information the

15.

police had was the bare report of an anonymous tipster, and upon arriving at the scene, the appellant was merely sitting in his car. The court determined that there "were insufficient surrounding circumstances to provide the officers with reasonable suspicion of criminal activity," and concluded that appellant's motion to suppress should have been granted. *Id.* at ¶ 16.

{¶ 40} And in *State v. Caplinger*, 5th Dist. Muskingum Nos. CT2017-0087, CT2017-88, 2018-Ohio-3230, a citizen called to report that he had seen a white Chevrolet Blazer with temporary tags parked at a gas station for 30 minutes and two individuals were rummaging through the vehicle. When the responding officer arrived at the gas station, the vehicle was no longer there, but he saw that it was parked at a nearby McDonald's restaurant. The officer activated his lights and parked closely enough behind the vehicle that it would have taken considerable maneuvering to back out without hitting the cruiser. The officer ultimately arrested the driver for driving while intoxicated.

{¶ 41} The Fifth District concluded that the trial court erred in denying a motion to suppress evidence. It held that the stop had been initiated without reasonable, articulable suspicion of criminal activity. In reaching this conclusion, the court noted that the concerned citizen had not reported that appellant appeared to be intoxicated or under the influence and about to operate the vehicle. "The only 'suspicious crime' was 'rummaging' through the vehicle." *Id.* at ¶ 30. Given the totality of the circumstances,

16.

the court found that the officer lacked reasonable suspicion to believe that appellant was involved in criminal activity so as to warrant the investigative stop.

{¶ 42} We reach the same conclusion here. Williams was merely sitting in a running vehicle in the parking lot of an establishment that was still open. No criminal activity was reported by the 9-1-1 caller. And no other "suspicious" conduct was observed so as to justify a finding of reasonable, articulable suspicion.

{¶ 43} *The officer's training and experience.* The officers here had three years and three-and-one-half years' experience. Beyond their years of service, no other testimony was offered as to the officers' training or experience that would enable them to conclude that the conduct reported and observed here provided a basis for suspecting that criminal activity was afoot.

{¶ 44} *Whether the officer knew of recent criminal activity in the area.* In *Freeman*, 64 Ohio St.2d 291, 295, 414 N.E.2d 1044, one of the factors providing the basis for finding reasonable, articulable suspicion was the officer's awareness that there had been recent criminal activity in the motel parking lot where he stopped the defendant. Here, the officers testified that there had been numerous heroin overdoses in the city of Toledo and that they had seen "plenty of calls" involving intoxicated persons sitting in cars. But they admittedly received no information indicating that the driver of the vehicle here was intoxicated or under the influence of drugs. And they provided no testimony indicating that recent criminal activity had transpired in the area. *See City of Chillicothe v. Frey,* 156 Ohio App.3d 296, 2004-Ohio-927, ¶ 21 (4th Dist.) (finding that in absence

17.

of evidence that there had been recent criminal activity, officers lacked reasonable, articulable suspicion to stop appellant as he carried something through alley at 5:00 a.m.). We conclude here that this factor does not counsel in favor of finding reasonable, articulable suspicion.

{¶ 45} *Whether the stop occurred in a high crime area.* Ohio courts recognize that "[t]he reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely in determining whether an investigative stop is warranted." (Citations omitted.) *Bobo*, 37 Ohio St.3d 177, 179, 524 N.E.2d 489. But while this may be considered as a factor in weighing the totality of the circumstances, "it is [also] well settled that an individual's presence in a high-drug area does not suspend the protections of the Fourth and Fourteenth Amendments" and cannot be the only fact relied on to warrant a stop. *See State v. Jackson*, 2017-Ohio-1369, 89 N.E.3d 98, ¶ 6 (8th Dist.) (finding no reasonable, articulable suspicion where detectives initiated stop of occupied vehicle parked on side of road at 11:00 p.m. in area known for "heavy gang activity"); *State v. Lynch*, 196 Ohio App.3d 420, 2011-Ohio-5502, 963 N.E.2d 890, ¶ 32 (8th Dist.) (leaning into a car then scurrying to legally-parked SUV at midnight in area of high-drug activity not sufficient to justify investigative stop); *State v. Belcher*, 2d Dist. Montgomery No. 24385, 2011-Ohio-5015, ¶ 31 ("The mere fact that this innocent or ambiguous conduct occurred in an area where crimes had occurred does not make it criminal in character or give rise to a reasonable suspicion of specific criminal activity.").

18.

A police officer "must still be able to point to specific facts to justify their conclusion that this defendant was engaged in criminal activity." *Lynch* at ¶ 32.

{¶ 46} After the state and defense counsel examined Officer Murphy at the suppression hearing, the trial judge asked questions of the officer relating to whether the gas station was located in a high-crime area:

> The court: This area of town, Manhattan and Stickney, is this a higher crime area? Lower crime area? Moderate crime? Does it make much of a difference? I don't know that we've heard on the record what you're actually patrolling.
>
> Officer Murphy: Well, the dividing line in that area between the North End, which is Two Sector, and Eleven Sector is the Interstate 75 North, which at that point runs east to west, the One Sector area that runs north of the interstate is a one-man unit area because it is deemed safer that the North End. So compared to that it is more of a high crime area.
>
> The court: So you guys were running a two person unit as you have already testified.
>
> Officer Murphy: Correct.
>
> The court: That signifies a little more concern for officer safety, is that what I am to interpret it as?
>
> Officer Murphy: Yes, sir.

19.

In explaining its reason for denying Williams's motion, the court took judicial notice of the fact that this was an "area of higher than normal criminal activity."

{¶ 47} We see a distinction between characterizing an area as one of "high-crime" and characterizing it as an "area of higher than normal criminal activity" or "more of a high crime area" than an adjacent area. *Compare State v. Jarnigan*, 2d Dist. Montgomery No. 22682, 2009-Ohio-1640, ¶ 9 (affirming denial of motion to suppress where a nine-and-one-half year member of Narcotics Bureau testified that detectives encountered individuals utilizing secluded areas of parking lots of four specific businesses "pretty much on a daily basis," and the area was "a very high drug area"). But even if we were to agree that this was established to be a high-crime area, this fact alone cannot serve as the basis for finding reasonable, articulable suspicion. *See Jackson* at ¶ 6.

{¶ 48} In sum, we cannot say that under the totality of the circumstances here, the officers had reasonable, articulable suspicion for detaining Williams. The information conveyed to the officers did not allege any criminal activity, the officers did not observe any criminal activity, and the relevant factors do not support a finding of reasonable, articulable suspicion. Accordingly, we find Williams's first assignment of error well-taken. We vacate his conviction and remand to the trial court for further proceedings.

### B. The Imposition of Costs

{¶ 49} In his second assignment of error, Williams argues that the trial court erred by failing to notify him on the record in open court that it had imposed the costs of

20.

prosecution, supervision costs, confinement costs, assigned counsel costs, and costs imposed under R.C. 9.92(C), 2929.18, and 2951.021.

{¶ 50} The state counters that under R.C. 2947.23, a trial court must impose the costs of prosecution, and the court's failure to orally notify a defendant of the costs of prosecution is considered harmless error. It acknowledges this court's decision in *State v. Jones,* 6th Dist. Lucas No. L-17-1010, 2018-Ohio-892, finding that imposition of the remaining costs outside the defendant's presence constitutes reversible error, but it seeks to "preserve the issue for future appeal."

{¶ 51} Given our resolution of Williams's first assignment of error, vacating his conviction, we need not address his second assignment of error.

### III. Conclusion

{¶ 52} Applying the totality-of-the-circumstances test, we find that the officers here lacked reasonable, articulable suspicion to initiate an investigative stop of Williams's vehicle. We, therefore, reverse the June 2, 2017 judgment of the Lucas County Court of Common Pleas and remand this matter to the trial court for proceedings consistent with this decision. In light of our resolution of Williams's first assignment of error, we need not address his second assignment of error. The state is ordered to pay the costs of this appeal under App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                                    _____

                                                                        JUDGE

Thomas J. Osowik, J.

                                                        _____

Christine E. Mayle, P.J.                                  JUDGE
CONCUR.

                                                        _____

                                                                        JUDGE

---

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.