OPINION *Page 2 
{¶ 1} On July 2, 2007, appellant, Josey Brill, a juvenile, was cited for operating a motor vehicle without a valid driver's license in violation of R.C. 4510.12.
 {¶ 2} On January 11, 2008, appellant filed a motion to suppress, claiming an illegal stop. A hearing was held on February 6, 2008. By judgment entry filed February 7, 2008, the trial court denied the motion.
 {¶ 3} An adjudicatory hearing was held on March 25, 2008. By judgment entry filed May 9, 2008, the trial court found appellant to be a juvenile traffic offender for violating R.C. 4510.12. Appellant was subsequently fined $100.00 plus costs.
 {¶ 4} Appellant filed an appeal and this matter is now before this court for consideration. Assignment of error is as follows:
 I {¶ 5} "THE COURT ERRED IN DENYING THE MOTION TO SUPPRESS EVIDENCE."
 I {¶ 6} Appellant claims the trial court erred in denying his motion to suppress based on an illegal stop. Appellant claimed a lack of reasonable suspicion of criminal behavior to warrant the stop. We disagree.
 {¶ 7} There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. State v. Fanning (1982),1 Ohio St.3d 19; State v. Klein (1991), 73 Ohio App.3d 485; State v.Guysinger *Page 3 
(1993), 86 Ohio App.3d 592. Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. State v. Williams (1993),86 Ohio App.3d 37. Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. State v. Curry (1994), 95 Ohio App.3d 93; State v.Claytor (1993), 85 Ohio App.3d 623; Guysinger. As the United States Supreme Court held in Ornelas v. U.S. (1996), 116 S.Ct. 1657, 1663, ". . . as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal."
 {¶ 8} In Terry v. Ohio (1968), 392 U.S. 1, 22, the United States Supreme Court determined that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." However, for the propriety of a brief investigatory stop pursuant to Terry, the police officer involved "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21. Such an investigatory stop "must be viewed in the light of the totality of the surrounding circumstances" presented to the police officer. State v. Freeman (1980), 64 Ohio St.2d 291, paragraph one of the syllabus. *Page 4 
 {¶ 9} In denying appellant's motion to suppress, the trial court heard the following testimony from Corporal Morgan Eckelberry of the Village of West Lafayette during the suppression hearing, and concluded sufficient facts were presented to warrant the investigatory stop:
 {¶ 10} "Q. While you were on patrol, you observed a white minivan; is that correct?
 {¶ 11} "A. That is correct.
 {¶ 12} "Q. If you could just walk the court through what you observed when you came across the white minivan.
 {¶ 13} "A. I have to refer back to my statement. It's been a while. I was on Center Street, the 400 block, when I observed the minivan. It was occupied by three subjects. Two appeared to be males, one a female. As soon as they saw me, they appeared to be very nervous. I ran the registration. And the vehicle turned down an alley. By the time I got back around, the vehicle was on Fair Street and had turned into a driveway. I didn't recognize the vehicle as being — belonging at that residence, out of county sticker. Again, as I was approaching, the subjects were still watching me, appearing very nervous.
 {¶ 14} "Q. You were approaching in the cruiser at this time?
 {¶ 15} "A. Yes, I was.
 {¶ 16} "Q. Were they still in the vehicle at that time?
 {¶ 17} "A. Yes, they were.
 {¶ 18} "Q. Were they stopped in the driveway of this house?
 {¶ 19} "A. Yes. They had pulled in the driveway and stopped. *Page 5 
 {¶ 20} "Q. Go ahead.
 {¶ 21} "A. So I stopped just to do an investigative stop. In speaking with the driver, Mr. Brill, he stated that he did not have a license. That he had come down to pick up a friend for the female passenger.
 {¶ 22} "Q. Let's back up and go through this. When you said that you ran the registration of the vehicle. What did you learn from running the registration?
 {¶ 23} "A. Upon running the registration, the registered owner was under a failure to reinstate her license.
 {¶ 24} "Q. So the titled owner to the vehicle — registered owner of the vehicle did not have a valid driver's license?
 {¶ 25} "A. That's correct.
 {¶ 26} "Q. And this was — did you discover this prior to stopping and talking to Mr. Brill?
 {¶ 27} "A. Yes, I did.
 {¶ 28} "Q. Okay. The house that they turned into, the driveway, you were familiar with that house?
 {¶ 29} "A. Right. The owners had just purchased the place between four and six months prior to this date. And we go by that area pretty frequently because of the bus garage, which is on our security checks. And I have never seen that van there. And the people that moved into the residence are an older couple. It just didn't fit the area and with their actions.
 {¶ 30} "Q. Did their nervousness also play into your wanting to stop and finding out why they were in that driveway? *Page 6 
 {¶ 31} "A. Yes.
 {¶ 32} "Q. When you stopped and approached Mr. Brill, was he in the vehicle or outside the vehicle?
 {¶ 33} "A. He was in the vehicle, in the driver's seat.
 {¶ 34} "Q. When you approached the vehicle, was the vehicle parked?
 {¶ 35} "A. Yes.
 {¶ 36} "Q. Was the engine still running?
 {¶ 37} "A. I don't recall.
 {¶ 38} "Q. Did you ever turn on your overhead lights or start an official traffic stop?
 {¶ 39} "A. No. I did turn my lights on after initially speaking with Mr. Brill, due to the fact my cruiser was in the street.
 {¶ 40} "Q. And based upon your training and experience, do you feel that your questions to Mr. Brill were justified under the circumstances?
 {¶ 41} "A. Yes, I do." February 6, 2008 T. at 5-8.
 {¶ 42} Our first inquiry is whether this was a consensual encounter or a stop à la Terry.
 {¶ 43} "The first type is a consensual encounter. Encounters are consensual where the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away. * * * The request to examine one's identification does not make an encounter nonconsensual. * * * Nor does the request to search a person's belongings. * * * The Fourth Amendment guarantees are not implicated in such an encounter unless the police *Page 7 
officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's request or otherwise terminate the encounter. * * * Once a person's liberty has been restrained the encounter loses its consensual nature * * *
 {¶ 44} "* * *
 {¶ 45} "The second type of encounter is a `Terry stop' or an investigatory detention. The investigatory detention is more intrusive than a consensual encounter, but less intrusive than a formal custodial arrest. The investigatory detention is limited in duration and purpose and can only last as long as it takes a police officer to confirm or dispel his suspicions. A person is seized under this category when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority a reasonable person would have believed that he was not free to leave or is compelled to respond to questions.* * *" State v. Taylor (1995), 106 Ohio App.3d 741, 747-748. (Citations omitted.)
 {¶ 46} In State v. Wallace (2001), 145 Ohio App.3d 116, 122, our brethren from the Sixth District stated the following:
 {¶ 47} "Some general rules have evolved over time to determine whether an encounter is consensual. First, as the state points out in its argument, the United States Supreme Court in Terry v. Ohio,392 U.S. at 19, 88 S.Ct. at 1879, 20 L.Ed.2d at 905, fn. 16, indicated that an encounter does not change from consensual into a seizure unless the officer uses force or a show of authority to restrain the liberty of the person the officer has approached to question. Second, in regard to whether a restraint has occurred, courts must consider whether the reasonable, innocent person would feel free *Page 8 
to leave or to end the encounter with the police officer.* * * Third, the subjective intent of the officer to allow the individual to leave is irrelevant; the test is objective and is based upon whether a reasonable person would have felt free to leave. * * * Fourth, courts must look at the totality of the circumstances of each case to decide whether, under the facts in that case, the encounter changed from consensual to a seizure that triggered Fourth Amendment rights. * * * Finally, the Supreme Court of the United States has indicated that there must be both a show of authority and a submission to that authority to constitute a seizure." (Citations omitted.)
 {¶ 48} It is clear from the evidence that Corporal Eckelberry never activated his lights nor signaled for appellant to stop. T. at 7. To the contrary, appellant pulled his vehicle into a residential driveway and stopped voluntarily before Corporal Eckelberry could go around the corner to follow appellant. T. at 5. Corporal Eckelberry approached the vehicle and asked the driver for a registration. T at 6. Appellant informed Corporal Eckelberry that he did not have a driver's license. Id. Appellant was seated inside the vehicle in the driver's seat. T. at 7.
 {¶ 49} We conclude there was no outward "show of authority" by Corporal Eckelberry in effectuating the stop. At the time of the encounter, appellant was on private property, and Corporal Eckelberry knew the property was owned by an older couple. T. at 7. Typically the owners park their vehicles in the driveway, and appellant's vehicle did not match either vehicle. T. at 10. The mere fact that Corporal Eckelberry asked for identification did not create a "Terry stop." Corporal Eckelberry admitted that had appellant pulled out of the driveway and left, he would have stopped him by a show of authority. T. at 9. We conclude even though it appears by the facts to *Page 9 
be a consensual encounter, appellant was not free to refuse to give him his driver's license. We therefore conclude the stop sub judice was a"Terry stop."
 {¶ 50} In State v. Andrews (1991), 57 Ohio St.3d 86, the Supreme Court of Ohio adopted the totality of the surrounding circumstances test in determining reasonable suspicion. These circumstances are not viewed in hindsight on appellate review, but are viewed "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.* * * A court reviewing the officer's actions must give due weight to his experience and training and view the evidence as it would be understood by those in law enforcement." Andrews, at 87-88. (Citations omitted.)
 {¶ 51} In this case, the facts are basically undisputed. Corporal Eckelberry was an experienced police officer with some fifteen years of experience and six to seven years in West Lafayette, Ohio. T. at 11. He observed an out-of-county van as indicated on the license plate in a driveway where the owners of the residence are older. T. at 5, 7. The owners' vehicles were usually parked in the driveway, and were not similar to the vehicle being driven by appellant. T. at 7, 10. The three occupants of the vehicle appellant was operating appeared to be nervous and did not make eye contact with Corporal Eckelberry. T. at 5-6, 10-11.
 {¶ 52} We find that any one of these items alone does not equate to reasonable suspicion, but the totality of them do equate to reasonable suspicion. Overriding all of Corporal Eckelberry's observations is the size of the community of West Lafayette, Ohio. If these facts happened in Cleveland or Columbus, our conclusion might very well be different. *Page 10 
 {¶ 53} Upon review, we find the trial court did not err in denying appellant's motion to suppress.
 {¶ 54} The sole assignment of error is denied.
 {¶ 55} The judgment of the Court of Common Pleas of Coshocton County, Ohio, Juvenile Division is hereby affirmed.
Farmer, P.J., Gwin, J., and Edwards, J., concur. *Page 11 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Coshocton County, Ohio, Juvenile Division is affirmed. Costs to appellant. *Page 1